IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MELISSA SUE BELLOWS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-11-001530 |
| | § | |
| MICHAEL J. ASTRUE, COMMISSIONER | § | |
| OF THE SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
## DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 11) and Defendant's Cross-Motion for Summary Judgment and Memorandum in Support (Documents Nos. 9 & 10), and Response to Plaintiff's Motion for Summary Judgment (Document No. 13). Having considered the cross motions for summary judgment, the administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

---

1 On February 28, 2012, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 8.

## I.    Introduction

Plaintiff Melissa Sue Bellows ("Bellows") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits.  Bellows argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision that she has the "residual functional capacity to perform medium work activity." (Tr. 22).  In addition, Bellows maintains that the ALJ erred by not properly considering her treating physician's opinion, not applying the appropriate criteria adopted by the Social Security Administration ("SSA"), failing to consider medication side effects, and failing to properly consider her allegations of depression and anxiety problems.  The Commissioner, in contrast, contends that there is substantial evidence in the record to support the ALJ's decision that Bellows could engage in past relevant work. Furthermore, the Commissioner argues that the ALJ applied the proper criteria for evaluating Bellows's depression and anxiety related symptoms, appropriately evaluated the opinion of her treating physician and medication side effects in assessing Bellows's credibility.

## II.    Administrative Proceedings

On March 30, 2009, Bellows applied for Title II benefits, claiming that she became disabled beginning December 24, 2008, due to residuals from a stroke, headaches, vertigo, confusion, back pain, diabetes, fibromyalgia, a heart condition, arthritis, scoliosis, a sleep disorder, fatigue, depression, and mitral valve prolapse. (Tr. 15, 32, 37, 39, 120-21, 128).[2]  The SSA denied her application at the initial and reconsideration stages.  After that, Bellows

---

2"Tr." refers to the transcript of the administrative record

requested a hearing before an ALJ. The SSA granted her request and the ALJ, Paul W. Schwarz, held a hearing on January 26, 2010, at which Bellows's claims were considered *de novo*. (Tr. 29). On March 3, 2010, the ALJ issued his decision finding Bellows not disabled. (Tr. 12-28).

Bellows sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 404.970; 20 C.F.R. § 416.1470. After considering Bellows's contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on February 2, 2011, that there was no basis upon which to grant Bellows's request for review. (Tr. 1-4). The ALJ's findings and decision thus became final.

Bellows filed a timely appeal of the ALJ's decision. Both Bellows and the Commissioner have filed Motions for Summary Judgment (Documents Nos. 11 & 9). This appeal is now ripe for ruling.

## III. Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co., v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability under the Act has the burden of proving her disability. *Johnson*, 864 F.2d at 344. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

4

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to decide disability status:
>
> 1.   If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.   If the claimant does not have a "severe impairment" or combination of impairments, [he] will not be found disabled;
>
> 3.   If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4.   If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5.   If the claimant's impairment prevents [him] from doing any other substantial gainful activity, taking into consideration [his] age, education, past work experience and residual functional capacity, [he] will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden

of proof on the first four steps of the analysis to establish that a disability exists. *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999). If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *Id.* Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett,* 67 F.3d at 564.

Here, the ALJ concluded that Bellows was not disabled at step four because she retained the ability to perform her past relevant work. In particular, the ALJ determined that Bellows was not presently working (step one); that her cerebral vascular accident ("CVA" or "stroke"), transient ischemic attacks ("TIAs"), and lumbar degenerative disc disease were severe medical impairments but her migraines, heart condition, fatigue, vertigo, history of neck pain, arthritis, diabetes, and attention deficit hyperactivity disorder were not severe medical impairments, and her vision loss, fibromyalgia, depression, and anxiety were non-medically determinable impairments (step two). (Tr. 17-20). The ALJ did not find that any of Bellows's impairments, standing alone or in combination, satisfied the criteria of any of the Commissioner's Listing of Impairments located in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2006) (step three). (Tr. 21-22). The ALJ also concluded at step four that Bellows was able to perform her past relevant work as an audit clerk, a tax clerk, an assistant buyer, a legal secretary, and bank teller and had the residual functional capacity ("RFC") to perform a full range of medium work activity. (Tr. 25). In this appeal, the Court must determine whether substantial evidence supports the ALJ's step four finding that Bellows's impairments do not prevent her from engaging in her past relevant work, and whether the ALJ used the correct legal standards in arriving at that conclusion. In making

this determination, the court must consider whether the ALJ erred in finding that Bellows's depression and anxiety were non-medically determinable impairments, whether Bellows's medication side effects were properly considered, and whether proper weight was afforded to Bellows's treating physician's opinion.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren,* 925 F.2d at 126.

## V. Discussion

### A. Objective Medical Evidence

The objective medical facts show that Bellows suffers from cerebral vascular accident, transient ischemic attacks, and lumbar degenerative disc disease. Bellows claims disability based on a combination of all the impairments above. In her application for Social Security benefits, Bellows claims that her disability began on December 24, 2008. (Tr. 25).

Although Bellows alleged disability, in part, due to migraines, heart condition, fatigue, vertigo, history of neck pain, arthritis, diabetes, attention deficit hyperactivity disorder, vision loss, and fibromyalgia, a review of the medical record shows that Bellows routinely reported no problems to her doctors, and that most of her symptoms related to the above described conditions were generally controlled with medication or resolved with conservative treatment.

For example, Bellows repeatedly and consistently denied experiencing fatigue, frequent or unusual headaches, dizziness, visual changes, and musculoskeletal problems on various occasions to her treating physician, Dr.  Moussaoui. (Tr. 46-47, 187-88, 218-219, 222, 226, 230,

234, 276, 420-21, 424-25, 456). Also, on numerous doctor visits, Bellows's symptoms were classified as resolved or better. For instance, on her June 6, 2008, visit to neurologist Dr. Ali Moussaoui, the impression note states the following:

> Dizziness and vertigo. Better.
> Migraine headaches. Better.
> Neck pain radiating to the arms and shoulders possible cervical radiculopathy and cervical spondylosis. Better.
> Occipital neuralgia. Better.
> Heart vegetations, not infectious. Probably related to mixed connective tissue disease.

(Tr.431). A year later, on another visit to Dr. Moussaoui, the record again shows:

> Dizziness and vertigo. Better.
> Migraine headaches. Better.
> Neck pain, resolved
> Occipital neuralgia. Better.
> Heart vegetations, not infectious. Probably related to mixed connective tissue disease.

(Tr. 422). In Bellows's most recent visit to Dr. Moussaoui, on June 19, 2009, Dr. Moussaoui again noted:

> Dizziness and vertigo. Better.
> Migraine headaches. Better.
> Neck Pain history, resolved
> Occipital neuralgia. Better.
> Heart vegetations, not infectious. Probably related to mixed connective tissue disease.

(Tr. 427). Dr. Moussaoui noted Bellows's visual acuity was "20/20 bilaterally," "visual fields were intact," "no clubbing, cyanosis, or joint inflammation." Bellows had normal station and gait. (Tr. 422).

Further, Bellows's treatment notes from two other physicians reveal a similar trend. On a March 26, 2009, visit to Dr. Faizunnisa Anwar, the examination note states:

> Constitutional: Positive for fatigue (*moderate*).
> Eyes: Negative for blurred vision, eye pain, and photophobia.
> E/N/T: Negative for hearing problems, E/N/T pain, congestion, rhinorrhea, epistaxis, hoarseness, and dental problems.

Respiratory: Negative for cough, dyspnea, and hemoptysis.
Gastrointestinal: negative for abdominal pain, heartburn, constipation, diarrhea, and stool changes.
Musculoskeletal: Negative for arthralgias, back pain, and myalgias.

(Tr. 456). Similarly, on visits to Dr. Mahdi Al-Bassam, the review of systems revealed "no frequent or unusual headaches;" no "joint stiffness, pain, or restrictions of motion, redness, heat or bony deformities;" no "loss of balance;" and Bellows denied "fainting, loss of consciousness, weakness, paralysis, decreased sensation, difficulty with coordination, tremors, or loss of memory." (Tr. 188).

With respect to Bellows's alleged depression and anxiety, the ALJ made the determination that both ailments were non-medically determinable impairments at step two. The ALJ noted:

> The claimant also alleges disability due to depression and anxiety (Exhibits 2E2, 7E2). However, the undersigned finds that these are non-medically determinable impairments. Though a general practitioner prescribed Paxil to the claimant (Exhibit 18F4), the medical evidence of record does not reflect a diagnosis of depression or anxiety. Likewise, the claimant has not received any formal mental health treatment. Further, the claimant denied having psychiatric problems on multiple occasions (Exhibits 2F6, 10, 14, 18, 22, 12F3), and she repeatedly had normal mental status examinations (Exhibits 2F7, 11, 15, 19, 23, 10F58). This finding is supported by the opinions of Dr. Leela Reddy and Dr. Mehdi Sharifian, State agency psychological consultants (Exhibits 4F1, 7F13).

(Tr. 20). The record indicates Bellows did in fact see Dr. Faizunniza Anwar, a general practitioner, for depression on three different occasions. (Tr. 105, 465, 456). Bellows first visited Dr. Anwar on September 26, 2008. During this visit Dr. Anwar simply noted: "patient says she is depressed but she is on medications." (Tr. 470). The next visit alleging depression on November 17, 2008, Dr. Anwar wrote: "pts. Depression is stable on paxil cr." (Tr. 465). The third visit, on March 26, 2009, Dr. Anwar noted that Bellows's "depression...is quite stable." (Tr. 456). Depression is mentioned in Bellows's visits to Dr. Anwar in the "Mental Health

History" portion of the consultation notes. However, Dr. Anwar made no formal diagnoses, rather just computer generated notes on past self-reported mental health history, and Dr. Anwar's records reveal no formal treatment prescribed for Bellows other than "to continue her medication." (Tr. 70, 465, 457). Furthermore, just over a month after the March 26, 2009, visit to Dr. Anwar, Bellows visited Dr. Moussaoui.  On that visit Bellows denied "anxiety, depression or changes in mood." (Tr. 420). On the same visit, she had a normal mini-mental status exam. (Tr. 421).  Bellows repeatedly denied depression and anxiety on visits to Dr. Moussaoui and Dr. Al-Bassam.[3]

In connection with Bellows's disability application, Dr.  Leela Reddy completed a Psychiatric Review Technique on June 2, 2009.  (Tr. 247-259).  Dr. Reddy, based on her review of Bellows's medical records, opined that Bellows had no medically determinable impairment. Another State agency consultant, Dr.  Mehdi Sharifian, likewise completed a Psychiatric Review Technique on September 4, 2009.  Dr.  Sharifian opined that Bellows's alleged impairment was non severe.  In so doing, he wrote:

> 47 year old female alleging depression, anxiety and memory loss following a stroke. MER does document hx of stroke. MER shows no dx of depression or anxiety. Clmt is prescribed Paxil by general practitioner but is not receiving formal mental health treatment.
> …
>
> Clmt alleges her conditions worsened around 4/1/09. However, note from clmt's treating source dated 5/4/09 shows that she denied depression and anxiety on ROS. Pt was alert and oriented, no language dysfunction, normal recent and remote memory, insight good, judgment appropriate, and normal attention and concentration. No disturbance of mood noted. Clmt's score on MMSE was normal.
>
> Per 3373 claimant completes hygiene and grooming independently, takes care of her pet,

---

3  Bellows denied anxiety or depression on 05/4/2009 (Tr. 218); on 04/20/2009 (Tr. 222); on 03/30/2009 (Tr. 226); on 01/19/2009 (Tr. 230); on 12/29/2008 (Tr. 234); on 06/06/2008 (Tr. 429); on 11/28/2007 (Tr. 434); on 02/19/2008 (Tr. 440).

cooks, does chores, drives independently, shops, watches TV and uses the computer, talks on the phone with her children, and gets along adequately with others.

(Tr. 293).

For an impairment to be considered "severe," within the meaning of the Act, it must significantly limit an individual's ability to perform basic work activities. However, an impairment is "not severe" when medical evidence and other evidence establishes only a slight abnormality that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. 404. 1521. Upon this record, in light of the objective medical evidence, the ALJ did not err in finding the above described impairments, migraine headaches, heart condition, fatigue, vertigo, neck pain, arthritis, diabetes, attention deficit hyperactivity disorder,  as non-medically determinable or as non-severe.

With respect to Bellows's other aliments, in 2005, Bellows suffered a cerebral vascular accident, reflected by a November 28, 2007 MRI. (Tr. 238).   On January 21, 2008, she experienced right facial numbness and left hand weakness and was admitted to the care of attending physician Samuel Gardner, M.D. at Sugar Land Methodist Hospital. (Tr. 362). She was discharged and diagnosed with Transient Ischemic Attack. (Tr. 365). One week later, she again presented with facial numbness and headaches and was admitted to the care of attending physician Scott Rivenes, M.D. at the Sugar Land Methodist Hospital. (Tr. 353). She was released with diagnoses of "stroke and headache," and was advised to follow-up with her primary care physician, Dr. Ali Moussaoui. (Tr. 353).

Due to the emergency room visit, Dr. Moussaoui referred Bellows to cardiologist Mahdi Al-Bassam, M.D. for a cardiac evaluation on February 19, 2008. The details of the visit are found in the cardiac consultation summary:

> History of Present Illness: 46-year-old woman with a history of cerebrovascular accident involving the right side of her brain at the age of 43. The patient describes complete recovery from that event which apparently transpired in Sherman, Texas. The patient had done well until January of this year when she started developing right facial weakness with left-sided arm weakness. At that time the patient was admitted to the hospital and diagnosis with a TIA was made. According to the patient she has had MRI studies done which demonstrated an old stroke and a possible new TIA. The patient is coming for evaluation. The patient does describe having episodes of loss of balance occurring intermittently unprovoked and not associated with palpitations. She denied any history of diabetes, hypertension, gout, rheumatic fever or hypercholesterolemia. The patient does continue to smoke up to the present time. There is no history of exertional dyspnea, orthopnea, nocturnal dyspnea dyspnea, angina pectoris or myocardial infarction.

(Tr. 187). Dr. Al- Bassam also noted in the review of systems that Bellows did not have frequent or unusual headaches, dizziness, or periods of loss of consciousness. (Tr. 188). Bellows did not have "musculoskeletal problems, joint stiffness, pain, restrictions of motion, redness, heat, or bony deformities." (Tr. 188).  Also, the review of systems revealed Bellows denied "fainting, loss of consciousness, weakness, paralysis, decreased or loss of sensation, difficulty with coordination, tremors, or loss of memory" and Bellows did not have "depression, mood changes, difficulty concentrating, nervousness, tension, suicidal thoughts or irritability or sleep disturbances." *Id.*  Dr. Al-Bassam concluded Bellows suffered from "Mitral Valve Prolapse with supraventricular arrhythmia, systemic emboli, foramen ovale aneurysm, PFO." (Tr. 189). He ordered Bellows to have a 24-hour Holter monitor to evaluate for supraventricular arrhythmia. (Tr. 189). Dr. Al-Bassam also "admonished [Bellows] to discontinue smoking," after noting she smoked one and a half pack of cigarettes per day for the last 30 years. (Tr. 440).

About a month later, on March 4, 2008, Dr. Al-Bassam assessed Bellows in a "progress note." He noted that:

> The patient's echocardiogram demonstrates Mitral valve prolapse with calcification and pedunculated lesion on the mitral valve. Left atrial size however is normal. There is only a trace of mitral insufficiency. The patient's Holter monitor demonstrated no significant dysrhythmia. A review of the CT scan performed showed occlusion of the right vertebral

12

artery is only based on an embolus. The patient was advised to continue on her present medical program. The patient was started on Plavix 75 mg daily.

(Tr. 191). Bellows did well on her medication. However, Bellows stopped taking Plavix, prescribed to prevent heart attacks and strokes, for two months, and as a result once again presented to the emergency room on December 24, 2008, with weakness, confusion, arm numbness, and a headache. (Tr. 234). She was admitted to the care of Kenneth Totz , M.D. at the Sugar Land Methodist Hospital. (Tr. 332). She was diagnosed with Transient Ischemic Attack, and was referred to Dr. Moussaoui for assessment.  Bellows visited Dr. Moussaoui on December 29, 2008. The details of the assessment are as follows:

Interval History: Melissa Bellows is here for follow-up. She had another spell. She has stopped her Plavix recently. She had confusion with numbness. She was seen in the ER and was cleared.

Neurological Review of Systems: Her headache is better, but still has neck pain and back pain. She had weakness, numbness and tingling of the right face. Denies changes in speech pattern, aphasia or dysarthria. Denies prior episodes of syncop but had presyncopal spells. Denies tremor, dystonia, but has ataxia, stiffness and spasticity. Denies anxiety, depression or changes in mood.

Physical Exam:
This is a well-developed, well-nourished 45 year old in no acute distress.
Vitals: WT: Temp: RR: 19 HR: 81 BP: 120/75
Heent: Atraumatic/normocephalic. Sclera and conjuctivae normal.
Neck: Neck supple, probable carotid bruits. Trachea midline. No Masses.
Chest: Effort normal. Clear auscultation.
Cardiac: RRR, no murmurs, rubs, gallop.
Abdomen: Benign.
Extremities: No clubbing cyanosis, or joint inflammation. 2+ peripheral pulses.
Skin: No rashes, lesions, nodules, induration, or ulcers. No hyperpigmented lesions.

Neurological:
Mental Status: The patient is awake, alert and oriented to time, place, and person. No evidence of language dysfunction. Fluency, comprehension, naming and repetition are intact. Normal recent and remote memory. Insight is good, demonstrates fluent thinking and judgment is appropriate. Normal attention and concentration. There is no disturbance of mood. The patient has a normal mini-mental status exam.
Cranial Nerves: Visual acuity is 20/20 bilaterally. Visual field were intact. No

retinopathy. Disk margins sharp. There were no hemorrhages, exudates or Hollenhorst plaques. Pupils were equally round and reactive to light and accomodations. Extraocular eye movements intact. No diplopia or nystagmus noted. No ptosis evident. Versions normal. No facial weakness or sensory deficits. Jaw midline. Corneal reflex bilaterally. Normal hearing bilaterally. Tongue and palate are midline. Speech is clear. Normal sternocleidomastoid and trapezius.
…
Impression:
S/P recurrent right MCA Stroke.
S/P Tobacco abuse. She stopped.
Lower back pain with L5-S1 disc herniation. Resolved on conservative treatment.
History of stroke.
Memory Loss. Secondary to Stroke.
Dizziness and Vertigo. Better.
Migraine headaches. Better.
Neck Pain radiating to the arms and shoulders possible cervical radiculopathy and cervical spondylosis. Better.
Occipital neuralgia. Better.
Heart vegetations, not infectious. Probably related to mixed connective tissue disease.
S/P Pansinusitis. Better.
Probable mixed connective tissue disease.
Hypercholesterolemia. F/U by Dr Al-Bassam
Possible seizure, CP type

Plan:
Keep F/U with cardiology and PCP. F/U in 3 weeks or earlier if need be. Continue antiplatelet therapy. Continue Zanaflex/Keppra/vytorin/paxil CR and Cerefolin. Stressed to patient need to take vitamin and folic acid supplements. No driving discussed again. Schedule EEG monitoring. OK to go back to desk work for now.

(Tr. 234- 37). Bellows was allowed to go back to work. Bellows continued treatment with Dr.

Moussaoui and Dr. Al-Bassam throughout 2009.

On January 19, 2009, about a month after her last TIA, she came in to see Dr. Moussaoui.

The follow-up notes state the following:

Melissa Bellows is here for follow-up. She had no more spell. She has restarted all medications.
Neurological Review of Systems: Her headache is better, but still has neck pain and back pain. She had weakness, numbness and tingling of the right face. Denies change sin speech pattern, aphasia or dysarthria. Denies prior episodes of syncope but had presyncopal spells. Denies tremor, dystonia, but has ataxia, stiffness and spasticity. Denies anxiety, depression or changes in mood.

Dr. Moussaoui's recommended Bellows:

> Keep F/U with cardiology and PCP. F/U in 3 weeks or earlier if need be. Continue antiplatelet therapy. Continue Zanaflex/Keppra/vytorin/paxil CR and Cerefolin. Stressed to patient need to take vitamin and folic acid supplements. No driving discussed again. OK to go back to desk work for now. Consider increasing Keppra if have more symptoms.

(Tr. 230-33). Bellows continued to see Dr. Moussaoui complaining of headaches, neck pain, back pain, and memory problems. But by May 4, 2009, Dr. Moussaoui noted Bellows had "less headache, neck pain, and back pain." He also noted on May 19, 2009, that Bellows' migraine headaches were better, the neck pain was resolved, and the memory loss was secondary to her stroke. (Tr. 422). No other CVA or TIAs are present in the record.

With respect to Bellows's lumbar degenerative disc disease, Bellows first went to the emergency room complaining that she was unable to stand because of radiating low back pain into her right leg and foot on October 11, 2007.  Dr. Moussaoui conducted a physical at the hospital on October 15, 2007 and he noted the following:

> History of Present Illness: A 41-year-old otherwise healthy female except for history of migraines and complicated migraines presents with acute lower back pain that is severe with severe muscle spasms. She was admitted for further management with intravenous medication as p.o. medication failed to control the pain. She is also being admitted for an epidural injection.
> …
> Review of Systems: The patient was constipated for eight days before admission and she was given laxatives in the emergency room and had a bowel movement. No change in bladder habits were reported. An outside MRI showed mild disk bulging as L5-S1 without significant stenosis. There was mild bilateral foraminal narrowing.

(Tr. 387). On October 17, 2007, Dr. Moussaoui administered an "Epidural Steroid Injection" to Bellows's lower back, and he noted the injection was "uneventful…performed without immediate side effects or complications." (Tr. 400).  Dr. Moussaoui also performed a nerve conduction study and found "no evidence of mononeuropathy, radiculopathy or plexopathy in

the bilateral upper and lower extremities." (Tr. 244). A month later, on a follow-up visit to Dr. Moussaoui, Bellows said she was "feeling better as far as her back." (Tr. 434). Also on subsequent visits to Dr. Moussaoui her back pain was noted as "resolved on conservative treatment." (Tr. 236, 431). By May 2009 Bellows said her back pain was back, but a June 2009 lumbar spine MRI was "essentially unchanged" from her 2007 MRI, showing only "mild" disc bulging and "mild" scoliosis. (Tr. 419). The 2009 MRI revealed the following details:

> Diagnosis: Mild spondyloarthrictic changes and herniated disk at L5-S1 with mild bilateral foramenal stenosis. This study is essentially unchanged from the one done on October 15, 2007.

> Multi-slice T1 and double spin echo sagittal images and axial T1 images were performed on the lumbar spine from T12 to the sacrum.

> There is normal lumbar lordosis. The lower end of the spinal canal including the conus has a normal appearance. No abnormalities are noted in the cauda equina. The lumbar canal is clear. No abnormalities are noted in the the vertebral bodies of L1 through S2. Mild spondylo arthropathy and degenerative changes at L5-S1 with concentric disc bulging that extends to the bilateral lateral recesses as well as neural foramina abutting the anterior thecal sac and bilateral existing nerve roots leading to mild bilateral foramenal stenosis. The rest of the intervertebral disks in the lumbar and lumbosacral area have normal signal intensity and normal configuration. The rest of the exiting nerve roots in the neural foramen appear normal and there is no narrowing of the neural foramina.

> Mild facet arthropathy noted throughout May and L5-S1. Mild arthropathy was also noted in the bilateral sacroiliac joints.

(Tr. 419). Furthermore, other than "benign hemangiomas," another MRI of the "Thoracic Spine," administered on June 18, 2009, confirmed "no other abnormality seen in... the vertebral bodies. The intervertebral discs are normal size and configuration with normal signal intensity." (Tr. 428). The medical record shows no other notes from Bellows's physicians.

Dr. Steven Goldstein testified as an impartial medical expert. According to Dr. Goldstein, none of Bellows's alleged impairments met or equaled a listing 11.04 or 1.04.

Here, upon this record, the objective medical factor weighs in favor of the ALJ's conclusion that Bellows had the residual functional capacity to perform a full range of medium work.

### B. Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).

The Social Security Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

    (1) the physician's length of treatment of the claimant,

    (2) the physician's frequency of examination,

    (3) the nature and extent of the treatment relationship,

(4) the support of the physician's opinion afforded by the medical evidence of record,

(5) the consistency of the opinion with the record as a whole, and

(6) the specialization of the treating physician.

*Newton*, 209 F3d at 456. While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference. *Id.* Again, the Social Security Regulations provide guidance on this point. Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg. 34490 (July 2, 1996). In this Circuit, as in most others, before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d). *Newton*, 209 F.3d at 456. In the end, however, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

In this case, the treating physician is Dr. Moussaoui, Bellows's neurologist. On January 19, 2010, Dr. Moussaoui completed two questionnaires, a Lumbar Spine Residual Functional Capacity Questionnaire (Tr.   448-451), and a Stroke Residual Functional Capacity Questionnaire. (Tr. 443-447).  In the lumbar spine questionnaire, he opined that Bellows could sit for twenty minutes, she could stand for twenty minutes, and could sit/stand/walk less than two

hours in an eight-hour working day. He determined Bellows needed to take breaks during an eight-hour working day, at intervals of every half-hour. He also concluded Bellows could occasionally and frequently carry less than ten pounds, and rarely carry ten pounds. He found Bellows could never twist, stoop, climb ladders, or climb stairs, and he found she could rarely crouch. He stated Bellows had significant limitations in doing repetitive reaching handling or fingering. Overall, Dr. Moussaoui concluded that Bellows would be incapable of "even low stress jobs," she has more than four "bad days" during a month, and she has limiting factors that would "affect her job performance." (Tr. 447). Similarly, in the stroke questionnaire, Dr. Mousaoui described Bellows's prognosis as guarded. According to Dr. Mousaoui, Bellows's stroke and TIA's had left her "emotionally and functionally unable to adapt." (Tr. 447).

Bellows argues the ALJ failed to properly consider the opinion of treating physician Dr. Moussaoui. The Commissioner argues that Dr. Moussaoui's questionnaire responses were controverted by his own medical records, and as a result, the ALJ did not err in not giving the opinions controlling weight. In his evaluation of the evidence the ALJ explained:

> Consistent with SSR 96-2p, the undersigned has considered the opinions of Ali Moussaoui, M.D., the claimant's treating physician. In December 2008 and January 2009, Dr. Moussaoui authorized the claimant to return to "desk work." The undersigned concurs with Dr. Moussaoui's opinion that the claimant could return to work. However, in January 2010, Dr. Moussaoui limited the claimant to performing less than the full range of sedentary work. Little weight can be afforded to Dr. Moussaoui's most recent opinion because the less than sedentary limitation is unsupported by his findings on examination in 2009.

(Tr. 24). Further, the ALJ found that Bellows was able to perform medium work, consistent with the medical record and the opinion of the State's medical expert. The ALJ wrote:

> Further there are significant inconsistencies between the claimant's statements on record. For example, the claimant testified that her depression and anxiety are "intense." However, she denied having any mood changes or symptoms of anxiety or depression on multiple occasions throughout the medical records. (Exhibits 2F6, 10, 14, 18, 22).

19

Similarly, she testified about extreme fatigue, but she reported improvement in her somnolence with medication in 2009 (Exhibits 2F6, 11F3). Likewise, she testified that she experiences vertigo "a lot," but medical records indicate that her vertigo was "better" by December 2008. (Exhibits 2F8, 12, 16, 20, 24). Also, she testified to having impaired long term memory, but her remote memory was "intact" on multiple mental status examinations throughout the records (Exhibits 2F7, 11, 15, 19, 23, 18F4). Although said inconsistencies may not be the result of a conscious intention to mislead, nevertheless it suggests that the information provided by the claimant may not be entirely reliable.

As for the physical opinion evidence, the undersigned affords substantial weight to the opinion of impartial medical expert, Dr. Steven Goldstein. When combined with the record in its entirety, his opinion is supported by a preponderance of the evidence. At the start of his testimony, Dr. Goldstein gave an overview of the claimant's medical records discussed above in section three. In evaluating the claimant's severe impairments, Dr. Goldstein considered Listings 1.04 and 11.04, which he testified that the claimant does not meet or medically equal. Thereafter, Dr. Goldstein limited the claimant to performing medium level activity.

The undersigned concurs with the State agency medical consultant's opinion that the claimant is not disabled. However, based on Dr. Goldstein's testimony, the undersigned finds the claimant's residual functional capacity more consistent with the full range of medium work.

Consistent with SSR 96-2p, the undersigned has considered the opinions of Ali Moussaoui, M.D., the claimant's treating physician. In December 2008 and January 2009, Dr. Moussaoui authorized the claimant to return to "desk work" (Exhibits 2F21, 25). The undersigned concurs with Dr. Moussaoui's opinion that the claimant would return to work. However, in January 2010, Dr. Moussaoui limited the claimant to performing less than the full range of sedentary work (Exhibits 13F, 14F). Little weight can be afforded to Dr. Moussaoui's most recent opinion because the less than sedentary limitation is unsupported by his findings on examination in 2009 (Exhibits 2F8, 12, 16, 20).

With regard to the mental opinion evidence, the undersigned affords great weight to the opinions of the State agency psychological consultants, Leela Reddy, M.D., and Mehdi Sharifian, M.D. Dr. Reddy opined that the claimant's alleged depression and anxiety are non-medically determinable impairments (Exhibit 4F1). Thereafter, Dr. Sharifian confirmed that the claimant's alleged depression and anxiety are non-medically determinable impairments (Exhibit 7F13). Dr. Sharifian also opined that the claimant's ADHD is a non-severe impairment (Exhibit 7F1). Said opinions are supported by the objective medical evidence of record.

(Tr. 24). This statement demonstrates the ALJ recognized Dr. Moussaoui's opinion, but concluded the objective medical evidence in the record did not support the physician's opinion,

and found it was inconsistent with the record as a whole. (Tr. 24). This consideration is consistent with that required under 20 C.F.R. § 404.1527 (d)(2). Therefore, the ALJ properly evaluated Dr. Moussaoui's opinion, but ultimately rejected it as not being fully supported by the record. The ALJ had the discretion to make such a determination. *See Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (The ALJ has the sole responsibility for determining a claimant's disability status."). The ALJ properly considered Dr. Moussaoui's opinions in the two RFC questionnaires but weighed the questionnaires against the totality of his treatment records and the record as a whole. The diagnosis and expert opinion factor weighs in favor of the ALJ's decision.

### C. Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause the pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence of the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able

to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Bellows testified at the hearing that she suffers from headaches and back pain. Her attorney questioned her during the hearing and recorded the following:

Q: Do you experience headaches?

A: Oh, yeah.

Q: Tell—

A: Every, every day I'm- -

Q: Tell us about those headaches if you would. Did you say you have them every day?

A: Everyday and some days are worse than other.

Q: How long do they last?

A: Long enough for me to get my medication in me, be it, be it - - if, if I can cut it off fast enough, then I, I try to take Aleve because, you know, I just don't want that much prescription drugs in my system all the time, which it seems like it is. So I try to cut it off with Aleve. If it gets too intense, I have to take a prescription drug called Keppra and that is to stop any seizures and which mini strokes, TIAs are like a seizure, so.

Q: Do you - - where do you - - so they're painful, these headaches?

A: Uh-huh.

Q: Where do you experience the pain?

A: When they're intense I always feel them in the front part of my head on the right. They, they usually come in on the right and seem to push forward, like up behind my eyes into the skull right in here.

Q: And beyond taking your medications, is there anything else you do?

A: Lay down, lay down as- - usually as quick as I can. If I can get the weight of my head

off my body, it seems like if I can just lay down, you know, onto the bed, the couch, the - - get it on a pillow, just where- -

…

Q: Now, you said you have pain. Is this just confined to your head?

A: Oh, no sir.

Q: Okay. Where do you, where else do you experience pain?

A: My back really, really bad. I feel pain there a lot. I have a , I have a brace that goes around my body. It's like a corset that goes down my back. I, I couldn't manage a day without that. My disc, they bulge. I think that - -  I don't know if it's because the scoliosis of the spine that I have or have developed is causing the disc to bulge more or vice-versa, but my back is a, a constant pain and my legs and knee.

(Tr. 37-8). However, Bellows also testified that she goes on grocery trips alone, that she does dishes, separates and folds laundry, does "quick cooking," and goes out to eat to her favorite restaurants. (Tr. 142-49). In addition, the ALJ considered the fact that on repeated occasions Bellows denied pain, the objective medical facts show her headaches as "better," and her back pain as "resolved." The ALJ made a determination of Bellows' credibility and stated the following:

At the hearing, the claimant testified that she is unable to work because her overall health is "poor." She testified that her heart is "not healthy" for her age. Also, she has arthritis in her legs and knees, requiring her to wear a brace on her right knee "at all times." She has "really bad" back pain secondary to a disc bulge and scoliosis, for which she wears a back brace. She also has daily headaches, beginning in the front side of her head behind her eyes. To treat her headaches, she lays down "as soon as possible" and she uses Aleve. If the headache gets too intense, she takes Keppra. In addition, the claimant testified that she has suffered from one "massive" stroke and four mini-strokes. As a result, her long term memory is impaired and she gets easily confused. Although the claimant also complained of fatigue, she testified that she has insomnia and that she will often stay awake for up to two days at a time. Further, the claimant experiences vertigo "a lot," resulting in problems with depth perception and balance. She also has symptoms of anxiety and depression, including fear of new places, and feelings of failure, anger, and frustration. With regard to her activities of daily living, the claimant testified that she does very little housework. Nonetheless, she reported that she does dishes, separates and fold laundry, does

23

"quick cooking," goes on "quick" trips to the grocery store alone, goes on longer trips to the grocery store with her husband, and goes out to eat at a few favorite restaurants.  Though the claimant testified that she is unable to work, she does miss the "social bonding" that occurs in the work place.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In evaluating the persuasiveness of the testimony, the undersigned notes that the claimant described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. In addition to the activities mentioned in her testimony, the claimant completed a function report in which she indicated that she is independent in hygiene and grooming. Also, she reported that she cares for a pet, drives independently, watches television, uses the computer, and talks on the phone with her children. These are activities not typically engaged in by a totally disabled individual.

In addition, there is evidence that the claimant has not been entirely compliant in following the advice of her health care providers, which suggests that her symptoms may not have been as limiting as the claimant has alleged in connection with this application. For example, her treating physician, Dr. Ali Moussaoui repeatedly advised the claimant not to drive (Exhibits 2F9, 13, 17,21, 25).  However, the claimant reported driving independently in May 2009 (Exhibit 4E4).  Also, the claimant was prescribed Plavix for heart attack and stroke prevention, but she stopped taking it for two months in 2008 (Exhibit 10F4).  Additionally, she was advised to undergo a sleep study in March 2009, but she refused (Exhibit 2F13).

Further, the undersigned notes that there are significant inconsistencies between the claimant's statements on record.  For example, the claimant testified that her depression and anxiety are "intense."  However, she denied having any mood changes or symptoms of anxiety or depression on multiple occasions throughout the medical records (Exhibit 2F6, 10, 14, 18, 22).  Similarly, she testified about extreme fatigue, but she reported improvement in her somnolence with medication in 2009 (Exhibits 2F6, 11F3). Likewise, she testified she experiences vertigo "a lot," but medical records indicate that her vertigo was "better" by December 2008 (Exhibits 2F8, 12, 16, 20, 24).  Also, she testified to having impaired long term memory, but her remote memory was "intact" on multiple mental status examinations throughout the records (Exhibits 2F7, 11, 15, 19, 23, 18F4).  Although said inconsistencies may not be the result of a conscious intention to mislead, nevertheless it suggests that the information provided by the claimant may not be entirely reliable.

(Tr. 23-4). The ALJ decided that coupled with the inconsistencies[4] between the testimony and the medical record, Bellows was not entirely compliant with her doctor's orders, and that signaled her symptoms were not as limiting as Bellows alleged. For example, Bellows refused a sleep study suggested by her doctor on various occasions, she was admonished to stop smoking, which she eventually did, but only after repeated suggestions by her doctor, and two months prior to her last stroke, Bellows stopped taking her stroke medication.

Furthermore, with respect to Bellows's alleged medication side effects, there is simply no evidence in her medical record that indicates she ever complained of side effects to her physicians. In fact Dr. Moussaoui noted, on May 4, 2009, that Bellows had "no side effects from medications." (Tr. 218). He also noted "no side effects from medications" on April 20, 2009. (Tr. 222). She also denied side effects of medications to Dr. Al-Bassam on numerous occasions including December 28, 2008 (Tr. 205), March 3, 2008 (Tr. 191), April 1, 2008 (Tr. 198), June 3, 2008 (Tr. 200), June 17, 2008 (Tr. 203), and April 27, 2009 (Tr. 212).

Taking into consideration Bellows's medical records and testimony the ALJ thus found:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment.

(Tr. 24). It is within the province of the ALJ to make credibility determinations. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Because the ALJ made and supported his credibility

---

4.  For example, on November 2007 Bellows denied depression or anxiety. (Tr. 434). February 2008 she had no frequent unusual headaches, no musculoskeletal problems, no joint stiffness, pain, or restrictions. (Tr. 440). Denied fainting, fatigue, weakness. (Tr. 440). No depression, mood changes, difficulty concentrating. No loss of memory. (Tr. 440). February 2008 Denied fatigability, neck pain, vertigo. (Tr. 440). June 2008 denied depression, anxiety, and fatigue. (Tr. 431). Headache was "better." (Tr. 431).

determination, and because the ALJ did not rely on any inappropriate factors in making his credibility determination, this factor also weighs in favor of the ALJ's decision.

### D. Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age. A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(a).

The record shows Bellows was a 48-year-old individual with an Associate of Arts degree education at the time of the hearing before the ALJ. (Tr. 56). In the past Bellows has worked as a tax clerk, an assistant buyer, a legal secretary, an auditing clerk, and a bank clerk. The ALJ asked the vocational expert, Wallace Stanfill, a hypothetical question about jobs available to a person with the same skill set and residual functional capacity as Bellows. The ALJ asked:

> Q: Okay. All right. On the first hypothetical question, taking a hypothetical individual 48 years of age, has completed an Associate of Arts degree, having a residual functional capacity from an exertional standpoint for medium work as that term is defined in the Code, such a hypothetical described individual would be able to perform any of the past relevant work which you've identified?
>
> A: Yes Sir, this would be consistent with all of the past occupations.

(Tr. 56). As noted in the discussion of other factors, particularly subjective pain, the ALJ has made the determination that Bellows is not wholly credible, and therefore, his hypothetical question posed to the Vocational Expert was consistent with Bellows's RFC. Because there is substantial evidence in the record to support the ALJ's conclusion that Bellows can perform medium work and the vocational expert testified that Bellows could, within the range identified by the ALJ, perform relevant past work as a tax clerk, an assistant buyer, a legal secretary,

auditing clerk, and a bank clerk, the final factor of the age, education, and work history also supports the ALJ's decision.

## VI. Conclusion

Considering the record as a whole, the undersigned is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which directs a finding that Bellows was "not disabled." As such, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 9) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 11) is DENIED, and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this 13th day of August 2012.

Frances H. Stacy

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE